## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARBISONWALKER INTERNATIONAL, INC., | ) )  ) | Case No. 2:25-cv-01281 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| ANDREW PETERSHAGEN and PLIBRICO COMPANY, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff HarbisonWalker International, Inc. ("HWI" or the "Company") files this Complaint against Andrew Petershagen ("Petershagen") and Plibrico Company, LLC ("Plibrico," and together with Petershagen, the "Defendants").

### I.    INTRODUCTION

1.    This case concerns HWI's former employee's theft of the Company's trade secrets and his breach of his non-compete obligations, all for the benefit of his new employer, Plibrico.

2.    Petershagen was a HWI employee who decided to leave the Company for a more lucrative position with a competitor, Plibrico.  But he did not tell anyone at HWI about his plans. Instead, he spent more than a month systematically stealing the Company's proprietary information that he planned to exploit in his new position.  He sent himself information he needed to undercut HWI's business – customer lists, pricing data, technical drawings and internal sales tools, among other confidential information.

3.    With HWI's proprietary information in hand, Petershagen abruptly resigned from HWI and immediately began working for Plibrico, in violation of his non-competition

obligations to HWI.  In his new position with Plibrico, Petershagen has used and disclosed – and inevitably will continue to use and disclose – HWI's trade secret and proprietary information.

4.    The Defendants' misconduct strikes at the core of HWI's legitimate business interests: the Company has devoted countless resources and millions of dollars over many years to build its competitive position and foster its relationships with its customers.  By stealing HWI's proprietary information and ignoring Petershagen's contractual non-compete restrictions, Defendants seek to exploit HWI's investments and undermine HWI's position in the industry.

5.    As this case starkly illustrates, courts serve an indispensable role in protecting fair competition against theft and cheats.  HWI respectfully submits that this Court must do so here. In this action, HWI seeks injunctive and legal relief necessary to address irreparable and monetary harm caused by Defendants to its business, reputation, goodwill, customer relationships and overall competitive position in the industry.

## II.    PARTIES

6.    HWI is a Delaware corporation with its principal place of business at 2000 Park Lane Drive, Suite 400, Pittsburgh, Pennsylvania 15275.

7.    Petershagen is an individual who resides at 11502 Dorrance Lane, Meadows Place, Texas 77477.

8.    Plibrico is a Delaware limited liability company with its principal place of business at 1935 Techny Road, Northbrook, Illinois 60062.

## III.    JURISDICTION AND VENUE

9.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case arises, in part, under the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. ("DTSA").  This Court has supplemental jurisdiction over the state law claims in this action

under 28 U.S.C. § 1367 because the claims are so closely related to the DTSA claim that they form part of the same case and controversy.

10.      This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.

11.      This Court has personal jurisdiction over Defendants because they have conducted activities in, maintained sufficient contacts with and have otherwise caused harm in the forum in a manner sufficient to place them within the personal jurisdiction of this Court, as set forth more fully below.

12.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because, among other reasons, a substantial part of the events giving rise to the claims asserted in this Complaint – including Petershagen's access to and misappropriation of HWI's trade secrets, his execution of an employment agreement with HWI, and his work for HWI – occurred in this District, and Defendants are subject to the Court's personal jurisdiction over the claims described in this Complaint.

### IV.      FACTUAL BACKGROUND

#### A.      The Parties

13.      HWI is a leading international supplier of refractory products and related services, with roots dating back to 1875.

14.      HWI designs, manufactures and sells advanced refractory products used in steel, aluminum, petrochemical and other high-temperature industrial applications.

15.      Among other refractory product offerings, HWI's business includes the sale of refractory bricks and monolithic refractories, both of which serve the essential purpose of

protecting equipment from high temperatures, chemical exposure and mechanical wear –
extending operational life and improving energy efficiency.

16.    While traditional refractory bricks are installed similarly to masonry bricks,
monolithic refractories are supplied in bulk form and installed by pouring, gunning or molding
them to the required shape for a given application.

17.    HWI utilizes a two-prong market strategy, combining sales directly to end
customers with sales to trade partners – known as contractors and installers – who package the
Company's products and sell them to end customers along with other products and services.

18.    HWI employs a substantial sales force that is highly trained and knowledgeable
about the Company's products, services and customers.  The Company's sales representatives
sell directly to end customers and to contractors and installers.

19.    HWI sells its refractory products throughout the United States.

20.    Within the United States, a significant portion of HWI's sales in the refinery and
petrochemical industry are concentrated in the Southern United States, as much of the industry is
centered there.  Within that region, the refinery and petrochemical industry is further
concentrated in the Texas Gulf region.

21.    HWI first hired Petershagen on January 2, 2018, as a Projects Sales
Representative.

22.    In January 2021, HWI promoted Petershagen to Sales Representative II.

23.    In these sales roles, Petershagen had regular and frequent interactions with HWI's
Pennsylvania headquarters, which serves as the hub for HWI's operations.

24.     In his role as Sales Representative II, HWI assigned Petershagen a geographic sales territory comprised of the Texas Gulf Coast region, stretching from Beaumont, Texas, to Corpus Christi, Texas.

25.     Plibrico markets itself as a seller of refractory products for use in a variety of high-heat industrial applications, including in the refinery and petrochemical industry.

26.     Plibrico sells monolithic refractories and shaped refractories, which compete with traditional refractory bricks.

27.     Plibrico competes directly with HWI throughout the United States, including in Pennsylvania and in the Southern United States.

28.     Unlike HWI, most of Plibrico's refractory sales are made not through sales representatives but through regional suppliers, known as "PliPartners." Upon information and belief, Plibrico employs few, if any, employees who are responsible to sell products directly to end users.

29.     Many of Plibrico's PliPartners are themselves contractors and installers who offer their own installation services of Plibrico products to end customers.

30.     Plibrico's PliPartners who are not themselves contractors and installers sell to both contractors and installers and to end customers directly.

**B.     HWI's Business and Trade Secrets**

31.     HWI engineers, markets and supplies its refractory products to customers across a variety of industries, including iron and steel, ferrous and non-ferrous metals, refineries and petrochemicals, power generation and incineration, among others.

32.     Competition among refractory suppliers within these industries is fierce.

33.    HWI dedicates significant resources, time and money to maintain its competitive position in the marketplace, investing millions of dollars annually in research and development, product testing, customer-specific engineering and market analytics.

34.    HWI maintains a variety of confidential and proprietary information – including customer lists, pricing matrices, margin analyses, customer usage histories and forecasts, technical drawings, internal sales tools and presentations and other non-public data compilations – that is integral to its success in the market (collectively, the "Proprietary Information").

35.    In addition to the high quality of its products and services, HWI's success is built in significant part on its customer relationships and Proprietary Information, which cannot easily be replicated without a substantial investment of time, effort and money.

36.    HWI's Proprietary Information derives its value from remaining confidential.

37.    HWI's employees develop close working relationships with the Company's customers, including both end users as well as contractors and installers.  In so doing, the Company's employees gain an intricate understanding of customers' equipment, assets, needs, usage trends, cycles, operating requirements and other confidential information, all of which is used by HWI to tailor its products and services to customers' needs.  In that manner, HWI's employees also develop the Company's substantial goodwill and reputation in the industry.

**C.    HWI Protects the Secrecy of the Proprietary Information.**

38.    HWI undertakes significant efforts to maintain the confidentiality of the Proprietary Information.

39.    HWI protects its servers with passwords and offers tiered access credentials to its employees, ensuring that employees have access only to the Proprietary Information relevant to their job performance.

40.    HWI utilizes additional technological restrictions that prevent employees from accessing third-party email services on HWI devices.

41.    HWI maintains confidentiality policies in its Company Code of Conduct to outline the reasons for these restrictions and underscore the need to protect the confidentiality of the Proprietary Information:

> We must protect our company's confidential information at all times. This generally includes any nonpublic information that might be of use to competitors or others, which may be harmful to the Company if disclosed. Examples include business or marketing plans, sales information, supplier information, product design, manufacturing processes, Company financial information, trade secrets, existing and future merchandising information, and Employee information.

42.    The Code of Conduct further safeguards confidential information by (a) outlining the importance of safeguarding HWI's electronic devices and protocols for reporting lost or stolen devices, (b) identifying the risks of discussing confidential information in public areas and (c) establishing guidelines for safe use of internet, email and social media.

43.    HWI's employees are also subject to a separate Code of Business Conduct that stresses the importance of keeping Proprietary Information confidential:

> Confidential information is highly valuable property. It is a Group asset that includes intellectual property such as patents, trademarks, copyrights, trade secrets, and know-how. It also includes internal strategic, financial, technical or commercially sensitive information[.] . . . We all are responsible for protecting proprietary information and ensuring that it is used properly and shared only with other authorized persons to prevent any accidental, unauthorized or unprotected disclosure.

44.    In addition to these company-wide policies, HWI's employees who have access to the Proprietary Information must execute employment agreements that, among other things, describe information that is confidential and outline the requirements to ensure this sensitive information is protected.

45.    Among other provisions, these employment agreements confirm that "some of the work you will be called upon to perform hereunder, as well as information furnished you by [HWI] in connection therewith, is highly confidential," and require the protection of that information and prior written consent before such information can be used for any purpose.

46.    HWI also uses physical security and safeguard measures at its facilities, including in Pennsylvania, where its Proprietary Information resides, and prohibits visitors from viewing or accessing the Proprietary Information.

**D.    Petershagen's Job Responsibilities with HWI**

47.    In his roles with HWI, Petershagen was responsible for driving product sales by developing and maintaining relationships with customers, contractors and installers working in and located throughout the Texas Gulf region.  By virtue of the heavy concentration of refinery and petrochemical customers in Petershagen's assigned region, the vast majority of his sales were to that market segment.

48.    To perform his responsibilities, Petershagen routinely interacted with various personnel at HWI's operations hub in Pennsylvania – HWI's pricing, product management, marketing and applications support teams.

49.    For instance, Petershagen collaborated closely with HWI's applications support specialists on a regular basis.  Using his intimate working knowledge of HWI's products and their applications for refinery and petrochemical customers, Petershagen worked with the applications support team – and the technical skill of its team members – to match HWI capabilities to customer needs.

50.    Throughout his more than seven-year employment with the Company, Petershagen developed a deep understanding of HWI's products, technologies, customers, business strategies and customer-specific sales data.

51.     HWI devoted significant resources to educate and train Petershagen to enable him to perform his work for the Company.

52.     To perform his job, Petershagen regularly accessed, reviewed and utilized the Company's Proprietary Information.  Among other responsibilities, Petershagen utilized the Proprietary Information to craft proposals (to customers, contractors and installers), offer customer solutions and respond to customer inquiries.

53.     In a similar vein, Petershagen developed close relationships with customers throughout his territory.  He did so, in significant part, because of his access to HWI's high quality products, deep institutional knowledge and highly skilled resources.  Drawing on the Company's goodwill, Petershagen gained customer – and product – specific expertise and the ability to influence customers' purchasing decisions.

**E.     Petershagen's Contractual Obligations to HWI**

54.     As a condition of his employment with HWI, Petershagen signed an agreement containing confidentiality, non-compete and non-solicit obligations.

55.     Petershagen executed that agreement on December 5, 2017 (the "Employment Agreement"), when he was first hired by the Company.

56.     Notably, in January 2021, Petershagen was promoted to the role of Sales Representative II, a role that increased his scope of responsibilities and earning potential with the Company.

57.     The Employment Agreement is attached as Exhibit 1.

58.     Pursuant to the Employment Agreement, Petershagen agreed to treat as "highly confidential" all information developed or received during the performance of his duties and to refrain from publishing or using such information for any purpose without HWI's prior consent. (Ex. 1, Employment Agreement § 5(e).)

59.     Pursuant to the Employment Agreement, Petershagen also agreed, for a period of 24 months after his disassociation from the Company, not to compete with HWI or to solicit HWI's existing or prospective customers:

> (a) [Petershagen shall] not engage, directly or indirectly . . . in any Competing Business;
>
> (b) [Petershagen shall not] [s]olicit or induce, or attempt to solicit or induce, any customer or prospective customer of the Company to (i) purchase, lease, or procure any site, facility, goods or services which relate to or involve the refractory business from a source other than the Company or to (ii) cease doing business with the Company; and
>
> (d) [Petershagen shall not] [s]olicit or induce, or attempt to solicit or induce, any entity or person having an existing or prospective relationship with the Company to enter into a contract or other business arrangement with you or with any other person or entity, the intent or foreseeable result of which could be: (i) to divert or seize a business opportunity relating to or involving the refractory business anywhere in the world where the Company operates or which the Company has or had under consideration during your employment; (ii) to increase the Company's costs or economic exposure of doing business; (iii) to diminish the Company's sales or revenue in any line of business in which it is engaged; or (iv) otherwise to cause competitive or financial injury to the Company

(*Id*. § 6(a), (b), (d).)

60.     The Employment Agreement defines a "Competing Business," in relevant part, as follows:

> any person, corporation or other entity that sells or performs or attempts to sell or perform any services that are the same as or similar to the services sold or performed by the Company at the time your employment with the Company terminates in any geographic area where the Company operates or has conducted business within the two (2) years prior to the termination of employment.

(*Id.* § 6(a).)

61.     Petershagen acknowledged and agreed that the post-employment restrictions contained in the Employment Agreement are "reasonable and necessary for the protection of the

business of the Company, which involves supplying and servicing its customers within and outside the United States." (*Id.* § 6(f).)

62.     Petershagen acknowledged and agreed that "the remedy at law for any breach of the[se post-employment restrictions] will be inadequate and that the Company shall be entitled to injunctive relief in addition to any other remedy it might have." (*Id.* § 7.)

63.     The Employment Agreement contains severability and blue-pencil provisions. (*Id.* § 6(e)-(f).)

64.     The Employment Agreement contains a Pennsylvania choice-of-law clause. (*Id.* § 10.)

65.     In reliance on the aforementioned promises and representations, among others, HWI provided Petershagen with access to its Proprietary Information.

66.     During the course of his employment with HWI, Petershagen gained an intimate working knowledge of a broad range of HWI's Proprietary Information, including (without limitation) information relating to the Company's customer lists, products, R&D, financials, cost, pricing and margins, sales and business strategies, potential business opportunities, as well as information concerning customers' decision-makers, equipment, operating conditions, requirements, preferences, upcoming needs and other information that enabled HWI to capture an advantage over its competitors, including Plibrico.

67.     For example (and certainly without limitation), Petershagen had access to HWI's nationwide and region-specific pricing information and to the historic and future needs of refinery and petrochemical customers.

68.     Petershagen also developed a thorough understanding of the facilities, product needs and key personnel of HWI's largest customers in the Texas Gulf region.

69.    For instance, Petershagen spent significant time on site with and secured sizable sales to Customer $Z$,[1] one of HWI's largest petrochemical customers within Petershagen's territory.

70.    HWI would have never provided any of its Proprietary Information to Petershagen or entrusted him with its customer relationships absent Petershagen's commitment and contractual obligations to comply fully with all of the terms of the Employment Agreement and the Company's policies and procedures intended to protect the Company's proprietary and confidential information.

**F.    Petershagen Resigns from HWI to Join Plibrico, and Plibrico Purports to Provide Assurances to HWI.**

71.    On May 19, 2025, Petershagen tendered his two-week resignation notice to his supervisor.  He did not mention, however, that he was leaving to work for a competitor or that he intended to continue servicing his HWI-assigned territory in his new role.

72.    The next day, HWI discovered that Petershagen was planning to join Plibrico.  In the wake of that discovery, the Company accepted Petershagen's resignation effective immediately and terminated his access to the Company's information and systems.

73.    On June 10, 2025, HWI sent a letter (through counsel) notifying Plibrico and Petershagen of Petershagen's confidentiality, non-compete and non-solicit obligations, identifying HWI's concerns regarding Petershagen's potential violations of his confidentiality and non-compete obligations and requesting certain assurances and information concerning Petershagen's anticipated role with Plibrico:

> *First*, HWI requests a detailed description of Mr. Petershagen's employment responsibilities as well as the steps and precautions that Plibrico and Mr.

---

[1]    Because it is confidential, HWI omits the names of its customers from this complaint. HWI stands ready to provide this information to the Court under seal and to Defendants pursuant to an appropriate protective order.

Petershagen have taken and intend to take to ensure that his employment with Plibrico does not violate his post-employment obligations to HWI. *Second*, HWI requests a written certification that neither Mr. Petershagen nor Plibrico has used or disclosed any of HWI's confidential or proprietary information. *Third*, HWI requests a written certification that Mr. Petershagen has not and will not, for the term of his contractual obligations to HWI, solicit or otherwise directly or indirectly provide services on behalf of Plibrico in any geographic territory in which Mr. Petershagen worked, or about which Mr. Petershagen received confidential information, during his tenure with HWI. *Finally*, HWI requests written assurances that Mr. Petershagen has already returned or will immediately return any and all documents and electronic data relating in any manner to HWI that remain in his possession.

74.    In its response dated June 16, 2025, Plibrico (through counsel) (a) acknowledged that it was aware of Petershagen's contractual obligations to HWI when it offered him employment; (b) claimed that Plibrico made compliance with those obligations a condition of Petershagen's employment with Plibrico; (c) acknowledged that Petershagen's assigned territory with Plibrico – i.e., the "entire South Region" (consisting of 10 states) – would include but be broader than his former HWI territory; (d) claimed that Petershagen would "only" be selling products through a PliPartner in the Texas Gulf area and would not be "approaching any potential customers in the petrochemical / refinery industry" there; and (e) claimed that Plibrico would ensure that Petershagen would not interact with any of the customers he serviced on HWI's behalf.

75.    Plibrico's response also included a written acknowledgement from Petershagen and assured HWI that (a) Petershagen had returned or would immediately return all HWI documents and electronic data; (b) neither Plibrico nor Petershagen "used or disclosed HWI's confidential or proprietary information;" and (c) Petershagen had not and would not "solicit or otherwise directly or indirectly provide services" for any of Petershagen's HWI customers for the duration of the restrictive covenants contained in Petershagen's Employment Agreement.

76.     Notably, Plibrico's assurances to HWI fell short based, in part, on its artificially narrow reading of Petershagen's non-compete obligations.  In particular, Plibrico's response improperly interpreted Petershagen's non-compete obligations to prohibit only the direct solicitation of his former customers.  Under any reasonable reading, however, Petershagen's non-compete covenant plainly prohibits him from accepting a job with Plibrico (i.e., a direct competitor) within the geographic scope of his former employment with HWI (i.e., the Texas Gulf region).  In other words, although Plibrico sought to assuage HWI's concerns, its letter did the opposite by revealing that Petershagen's new job violates the plain terms of his post-employment contractual obligations to HWI.

77.     That revelation was only the tip of the proverbial iceberg.  In its hurried attempt to convince HWI that "there was nothing to see here," Plibrico's letter revealed much more than it intended.  Attached to Plibrico's response was a partially redacted copy of Plibrico's employment offer letter to Petershagen.  That document revealed for the first time that Plibrico offered Petershagen a job back on April 15, 2025 – i.e., nearly six weeks before Petershagen revealed his intention to resign from HWI and to join Plibrico.

78.     Plibrico's offer letter also indicated that it expired on April 18, 2025, and that Petershagen's employment, if he accepted the offer, was anticipated to begin on May 5, 2025.

79.     Petershagen did not provide a separate response to HWI's June 10, 2025 letter.

**G.     HWI's Recent Investigation Reveals Petershagen's Theft of HWI's Proprietary Information Before His Resignation.**

80.     For HWI, Plibrico's unintentional revelation raised additional red flags.  Having learned that Plibrico offered Petershagen a job nearly six weeks before his announced resignation, the Company has begun to undertake a broader investigation into Petershagen's pre-resignation activities.

81.     Although HWI's investigation remains in its early stages, the Company has already uncovered ample evidence that Petershagen began secretly stealing HWI's Proprietary Information in connection with his job with Plibrico.

82.     To date, HWI has reviewed Petershagen's HWI email account for the presence of emails sent by Petershagen to his personal email account.

83.     Based on that investigation, HWI was astonished to learn that Petershagen had stolen a broad range of HWI's Proprietary Information in the weeks after he received Plibrico's job offer, including the information discussed briefly in Paragraphs 84-97, below.

84.     On April 23, 2025, Petershagen forwarded to his personal email address two HWI emails containing confidential information related to a customer's request for a refractory product.

85.     After responding to the customer from his HWI email, Petershagen forwarded the email chain to his personal email.

86.     Later in the day, Petershagen forwarded the customer's original email to his personal email account.  Crucially, the customer's email included an attachment that had not been transmitted in the earlier email that Petershagen had sent to himself – a technical datasheet detailing the precise specifications of the product required by the customer.

87.     There was no legitimate reason for Petershagen to send that customer information to his personal email address.

88.     On April 25, 2025, Petershagen sent himself another email with a technical datasheet containing confidential refractory product specifications for a different customer.

89.     Later that same day, Petershagen sent himself an April 15, 2025 sales quote that he had prepared for the same customer.  The sales quote identified more than a dozen HWI products, the unit price for the products and the quantity of product requested by the customer.

90.     Unlike the customer emails that Petershagen sent to himself on April 23, 2025, the customer emails he sent on April 25, 2025 related to a customer's historical needs and not a current product request.  There was no legitimate reason for Petershagen to have sent that information to his personal email address, much less to do so after he had received (and had accepted or intended to accept) a job offer from Plibrico.

91.     Even more alarming, Petershagen sent himself four spreadsheets on April 25, 2025, containing nationwide contractor and installer pricing information for HWI's industrial refractory products and Texas Gulf-specific distribution center pricing for more than 200 industrial refractory products (the "Pricing Sheets").  Within HWI, the "industrial" market designation includes all refractory markets except the steel market, i.e., ferrous and non-ferrous metals, glass, power generation, chemicals and incineration, among others.  Petershagen predominantly sold to refinery and petrochemical customers and had no legitimate reason to send the Pricing Sheets to his personal email.

92.     The Proprietary Information contained in the Pricing Sheets provides HWI with significant competitive value.  In the wrong hands, this information would allow a competitor to strategically target specific HWI customers and product lines while finetuning their offerings to match or undercut HWI's prices.

93.     On April 29, 2025, Petershagen also sent to himself an email chain that attaches a document containing Proprietary Information regarding a large, global petrochemical customer. The email contains an HWI-prepared chart cross-referencing the customer's specification

numbers and codes with a usable description and then further connecting those customer specification numbers to the particular HWI legacy products and a new set of refractory products offered by HWI (known as "SPAR") that would be recommended by HWI for a particular customer specification (the "SPAR Sheet"). Indeed, that email chain includes a comment by an HWI contractor touting how valuable the SPAR Sheet is for working with that particular customer.

94.    On May 2, 2025, Petershagen sent to himself a whole swath of additional high-level Proprietary Information, including reports containing the following information for the 2023, 2024 and 2025 calendar years:

      a.   HWI's forecasted annual sales across all industries;

      b.   Annual sales by "ship to" salesperson; and

      c.   Annual sales by "sold to" salesperson.

The reports attached to the May 2, 2025 email are referred to as the "Annual Reports."

95.    On May 7, 2025, Petershagen forwarded himself an email from his direct supervisor containing a list of HWI's 17,000 unique refractory customers from across the world and across all industries, along with information relating to the salesperson and applications team member assigned to each customer account (the "Customer List").

96.    Also on May 7, 2025, Petershagen sent himself two emails containing new purchase orders from Customer *Z*, both of which were directed to the local HWI distribution center. Petershagen was not the primary recipient of these orders and was only copied on the emails because the order was being placed by Customer *Z*, one of his assigned customers. There was no legitimate reason for Petershagen to have sent these emails to his personal email either.

97.    Collectively, the Proprietary Information sent by Petershagen from his HWI email to his personal email between April 23, 2025, and May 7, 2025, is referred to as the "Misappropriated Proprietary Information."

98.    Petershagen's aforementioned conduct constitutes a violation of HWI's confidentiality policies and his Employment Agreement.

99.    With the Misappropriated Proprietary Information in hand, Petershagen had a ready-made playbook for targeting and undercutting HWI business on Plibrico's behalf.

**H.    The Court Should Enjoin Petershagen and Plibrico to Prevent Irreparable Harm to HWI.**

100.    HWI's investigation into Petershagen's conduct remains ongoing, and the Company expects that it will uncover additional information concerning Petershagen's pre-resignation misconduct in the weeks to come.  Further, given the surreptitious nature of Petershagen's conduct, HWI currently does not have the information necessary to determine the full scope and extent of his and Plibrico's improper activities.  HWI respectfully submits that discovery will shed additional light on these crucial facts.

101.    Even at this early stage of HWI's investigation, however, it is already clear that Petershagen has misappropriated HWI's trade secret and otherwise confidential information, and that information has been, is being and/or will continue being exploited for Plibrico's benefit.

102.    Upon information and belief, Petershagen sent the Misappropriated Proprietary Information to himself to use in his job with Plibrico and to target HWI's customer relationships.

103.    After he received (and, upon information and belief, accepted) Plibrico's job offer, Petershagen spent weeks secretly and systematically stealing HWI's Proprietary Information that provides an unfair advantage to Plibrico.  He stole confidential information concerning specific customers – including existing opportunities, requests and historical needs –

as well as information concerning HWI's business more broadly.  There was no reason for Petershagen to have sent that information to himself other than to exploit it for Plibrico's benefit and to enrich himself in the process.

104.    Armed with the Misappropriated Proprietary Information, Petershagen and Plibrico have a veritable blueprint to undercutting and competing unfairly with HWI.  And that is exactly what Plibrico expects Petershagen to do in his new role as a business development manager for that company.

105.    These revelations also prove false the (insufficient) assurances and representations previously provided by Plibrico on the Defendants' behalf.

106.    If Defendants' misconduct continues, HWI will suffer significant further harm to its reputation and goodwill, its customer relationships, sales and its market position.  Those harms will be impossible to calculate or redress fully.

107.    Given the nature of the refractory industry, it is not possible for HWI to assess all of the sales it has lost and stands to lose as a result of Defendants' conduct.  In particular, when HWI's customers purchase products from another supplier, they often do not disclose to the Company the identity of that supplier.  Nor do customers always explain to HWI the reasons for their decision to purchase products from a competitor.

108.    It is clear, however, that Plibrico has hired and employs Petershagen in direct violation of his non-compete obligations in the Employment Agreement.

109.    Under the circumstances, there is a substantial likelihood that Petershagen will be called upon to use and disclose HWI's trade secrets in performing his job responsibilities for Plibrico, making it inevitable that the Defendants will continue to misappropriate HWI's trade secrets and confidential information.

110.    Absent relief from the Court, Defendants' conduct will cause HWI to suffer further irreparable harm in the form of lost profits, lost customers, lost business opportunities, excess costs incurred by the Company in its efforts to mitigate the effects of the Defendants' unlawful conduct, damage to HWI's reputation and goodwill and the disclosure and use of HWI's trade secret information.  HWI has no adequate remedy at law for many of these injuries.

## COUNT I
### Trade Secret Misappropriation
### Defend Trade Secrets Act (18 U.S.C. § 1836)
### (HWI v. All Defendants)

111.    HWI incorporates by reference the allegations set forth in Paragraphs 1-110 of this Complaint.

112.    HWI's Proprietary Information, including the Misappropriated Proprietary Information, which is discussed in more detail in Paragraphs 83-97, is entitled to trade secret protection under the Defend Trade Secrets Act.

113.    HWI has invested and continues to invest substantial time, resources and money into developing its Proprietary Information to maintain its competitive position in the refinery and petrochemical refractory market.  Given the significant time, resources and funding required to develop this information, it would be exceedingly difficult for others to acquire or duplicate it using proper means.

114.    HWI's Proprietary Information relates to products and services used in, or intended for use in, interstate or foreign commerce.

115.    HWI has undertaken reasonable measures to protect the secrecy of its trade secret information.

116.    HWI's trade secret information has independent economic value to the Company.

117.    HWI's trade secret information is not generally known to the public or readily accessible using proper means.

118.    Petershagen has knowingly and intentionally misappropriated HWI's trade secrets, including (without limitation) the information contained in the Price Sheets, Annual Reports, SPAR Sheet and various customer emails, as well as his knowledge of other Proprietary Information.

119.    Upon information and belief, Plibrico has misappropriated and threatens to misappropriate HWI's Proprietary Information by acquiring it with knowledge that the trade secrets were acquired by improper means and using or planning to use the Proprietary Information.

120.    Further, Plibrico has misappropriated and threatens to misappropriate HWI's Proprietary Information because it is vicariously liable for Petershagen's conduct taken in the scope of his agency and employment with Plibrico.

121.    As a result of Defendants' improper conduct, HWI has suffered and, if Defendants' conduct is not enjoined, will continue to suffer, severe competitive harm, irreparable injury and significant damages in an amount to be proven at trial.

122.    HWI has also incurred, and will continue to incur, additional damages, costs and expenses as a result of Defendants' misappropriation.  As a further result of their misappropriation of HWI's trade secrets, Defendants have been unjustly enriched.

123.    The aforementioned acts of Defendants were willful and malicious.  HWI is therefore entitled to an award of punitive damages.

124.    Defendants' actions constitute misconduct of a continuing nature for which HWI has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court,

Defendants will continue to retain and use HWI's trade secrets to enrich themselves and divert

business opportunities from HWI.

## COUNT II
### Trade Secret Misappropriation
### Pennsylvania Uniform Trade Secrets Act (12 Pa. Cons. Stat. § 5301)
### (HWI v. All Defendants)

125.    HWI incorporates by reference the allegations set forth in Paragraphs 1-124 of

this Complaint.

126.    For the reasons set forth above, Defendants' conduct constitutes trade secret

misappropriation under the Pennsylvania Uniform Trade Secrets Act, and HWI is entitled to all

appropriate relief provided for therein.

## COUNT III
### Breach of Contract
### (HWI v. Petershagen)

127.    HWI incorporates by reference the allegations set forth in Paragraphs 1-126 of

this Complaint.

128.    HWI and Petershagen are parties to the Employment Agreement, which is a valid

and enforceable contract.

129.    The Employment Agreement contains non-competition, non-solicitation and non-

disclosure covenants that are reasonable in scope and duration.  Those terms are material

provisions of the Employment Agreement.

130.    Petershagen received material legal consideration in return for executing the

Employment Agreement.

131.    Under the terms of the Employment Agreement, Petershagen is obligated to use

HWI's Confidential Information solely for the benefit of HWI and only to the extent authorized

by HWI.

132.    HWI has performed all of its obligations under the Employment Agreement.

133.    Petershagen has materially breached his confidentiality obligations under the Employment Agreement by taking, retaining and/or disclosing the Misappropriated Proprietary Information and/or additional Proprietary Information, all of which must be treated as confidential under the terms of the Employment Agreement, for his own and Plibrico's benefit.

134.    Petershagen has materially breached his non-competition obligations under the Employment Agreement by accepting employment with a "Competing Business," as defined in the agreement, and working in the same geographic area where HWI operates and conducts business, including the Southern United States and the Gulf-region of Texas.

135.    As a result of Petershagen's material breaches of the Employment Agreement, HWI has suffered and will continue to suffer both irreparable harm and monetary damages, including, without limitation, lost profits, lost business opportunities, the loss of Proprietary Information and harm to the Company's reputation, goodwill and competitive advantage.

136.    Pursuant to the Employment Agreement, Petershagen agreed that his material breaches of that agreement have resulted in immediate and irreparable injury to HWI in amounts difficult to ascertain fully.  Consequently, Petershagen agreed that HWI shall be entitled to injunctive relief.

137.    Unless promptly enjoined, Petershagen's wrongful acts will continue.

**COUNT IV**
**Tortious Interference with Existing Contract**
**(HWI v. Plibrico)**

138.    HWI incorporates by reference the allegations set forth in Paragraphs 1-137 of this Complaint.

139.    HWI and Petershagen are parties to the Employment Agreement, which is a valid and enforceable contract.

140.    Under the terms of the Employment Agreement, Petershagen agreed that he would not use for his personal benefit or disclose to others, either during or after his employment, the Proprietary Information.

141.    He further agreed that he would return to HWI and not retain any documents and electronically stored information acquired or created by him as a result of his employment by HWI.

142.    Petershagen also agreed to restrict his post-employment competitive conduct for a period of 24 months after his disassociation from the Company.

143.    Plibrico was aware of the existence of the Employment Agreement.

144.    Plibrico intentionally procured breaches of the Employment Agreement.  Upon information and belief, Plibrico knowingly induced and/or encouraged Petershagen to breach his confidentiality obligations to HWI and sought to hire Petershagen in violation of his contractual obligations to HWI, including for the specific purpose of competing with HWI directly within the territory to which Petershagen was assigned as an HWI employee, and more broadly, within the Southern United States, where HWI also operates.

145.    Plibrico's interference with the Employment Agreement was without justification and intentional and improper.

146.    Plibrico acted with malice toward HWI when tortiously interfering with the Employment Agreement.

147.    HWI has suffered damages as a result of Plibrico's tortious interference with the Employment Agreement.

## **COUNT V**
### **Breach of Fiduciary Duty of Loyalty**
### **(HWI v. Petershagen)**

148.    HWI incorporates by reference the allegations set forth in Paragraphs 1-147 of this Complaint.

149.    As an employee of HWI, Petershagen owed to HWI duties of good faith and loyalty.

150.    Encompassed within those duties was an obligation not to act in a dual capacity to the disadvantage of HWI and the duty not to compete with HWI while employed with the Company.

151.    During his employment with HWI, Petershagen stole HWI's Proprietary Information for his personal benefit (as a future, and then a current, employee of Plibrico) or for the benefit of Plibrico.

152.    Plibrico's interests directly conflict with HWI's insofar as Plibrico competes directly with HWI for customers in the industrial refractory business.

153.    Those actions by Petershagen constitute competition with HWI and breaches of his duties of good faith and loyalty to HWI.

154.    Petershagen secured an advantageous position by virtue of his breach of fiduciary duties and confidential relationship with HWI.

155.    Equity requires that Petershagen be declared as trustee in a constructive trust for HWI with respect to all property, profits, interests and advantages obtained by him – or anyone else acting in concert with him – by virtue of his breach of his fiduciary duties and confidential relationship with HWI.

## <u>COUNT VI</u>
### Procuring Information by Improper Means
### (HWI v. All Defendants)

156.    HWI incorporates by reference the allegations set forth in Paragraphs 1-155 of this Complaint.

157.    Petershagen procured HWI's confidential information, in breach of his obligations to maintain the confidentiality of that information.

158.    Upon information and belief, Petershagen has used as an agent of or shared with Plibrico, and as such Plibrico has procured, HWI's confidential information through Petershagen's breach of his obligations to maintain the confidentiality of that information.

159.    Defendants accessed, possessed and used HWI's confidential information to advance their common competitive interests.

160.    HWI's confidential information is of economic value to HWI.

161.    HWI kept its confidential information private through all appropriate and necessary means, such that it was not generally known or available to individuals or entities outside of HWI.

162.    Defendants were and are aware of the proprietary and confidential nature of HWI's confidential information.

163.    Defendants' procurement of HWI's confidential information by improper means was done to provide Defendants with a commercial advantage.

164.    As a direct and proximate result of Defendants' wrongful conduct, HWI has suffered monetary and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff HarbisonWalker International, Inc. respectfully requests a judgment in its favor and against Defendants Andrew Petershagen and Plibrico Company, LLC as follows:

(a)    Upon hearing, a preliminary injunction to issue immediately and, upon final trial, a permanent injunction,

(i)    enjoining and restraining the Defendants from using or disclosing any of HWI's trade secret, proprietary or otherwise confidential information;

(ii)    enjoining and restraining Defendants from directly or indirectly engaging in any conduct or activity contrary to the terms of the Employment Agreement, including its non-competition, non-solicitation and confidentiality provisions;

(iii)    enjoining and restraining Petershagen from providing services to Plibrico (a) in the Texas Gulf Coast region, stretching from Beaumont, Texas, to Corpus Christi, Texas; (b) in the "South Region" designated by Plibrico; and (c) any other geographic markets in which HWI has done business or sought to do business within the United States within the last 24 months of his employment with HWI;

(iv)    enjoining and restraining Plibrico from interfering with HWI's Employment Agreement with Petershagen;

(v)    directing Defendants immediately to return to HWI all trade secret, proprietary and otherwise confidential information belonging or relating to HWI and its business that are within their possession, custody and control; and

(vi)    ordering any other relief that is just and proper under the circumstances.

(b)    After a final hearing, an award in HWI's favor and against Defendants for compensatory damages and/or an equitable accounting, disgorgement, reimbursement of all costs and expenses incurred in connection with this litigation, accounting, exemplary and punitive damages, attorneys' fees, interest and such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

DENTONS COHEN & GRIGSBY P.C.

By:  */s/ Fridrikh V. Shrayber*
    Fridrikh V. Shrayber
    (Pa. Id. No. 208083)
    Marcus B. Schneider
    (Pa. Id. No. 208421)

625 Liberty Avenue
Pittsburgh, PA  15222-3152
Phone:  (412) 297-4900
Fax:     (412) 209-1975
Email:  fred.shrayber@dentons.com
       marcus.schneider@dentons.com

Dated:  August 20, 2025

*Counsel for Plaintiff,*
*HarbisonWalker International, Inc.*